1

2

3

4

5

6                              UNITED STATES DISTRICT COURT
                                    DISTRICT OF NEVADA
7                                         * * *

8

9    UNITED STATES OF AMERICA,              )
                                            )
10                Plaintiff,                 )          2:07-cr-00261-PMP-RJJ
                                            )
11                                           )        REPORT &  RECOMMENDATION
     vs.                                     )            OF UNITED STATES
12                                           )           MAGISTRATE JUDGE
                                            )      (Defendant's Motion to Suppress #25)
13   NATHAN DENT,                            )
                                            )
14   _____Defendant._____)

15         This matter was referred to the undersigned Magistrate Judge on Defendant Nathan

16   Dent's Motion to Suppress (#25).  The Court has considered the Defendant's Motion (#25) and

17   the Government's Response (#29).  The Court conducted an evidentiary hearing on December 9,

18   2009.

19                                       **BACKGROUND**

20         On June 17, 2009, the United States filed a criminal Complaint against Defendants Nathan

21   Dent and Frank Morales alleging essential facts constituting the offense of armed robbery in

22   violation of 18 U.S.C. § 2113(a) and (d).

23         On June 30, 2009, the grand jury returned a four-count Indictment charging Dent with (1)

24   conspiracy to interfere with commerce by robbery in violation of 18 U.S.C. § 1951; (2) armed bank

25   robbery in violation of 18 U.S.C. § 2113(a) and (d); (3) brandishing a firearm during a crime of

26   violence in violation of 18 U.S.C. § 924(c); (4) felon in possession of a firearm in violation of 18

27   U.S.C. §§ 922(g)(1) and 924(a)(2).  The Government also sought forfeiture of certain property.  On

28   November 3, 2009, the grand jury returned a Superseding Criminal Indictment naming Dent in

     counts 1-3 but dismissing Count 4 (violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)) and the

1   forfeiture request as against Dent.

2   On June 16, 2009, at approximately 4:53 p.m., the Citibank branch office located at 103
3   South Rainbow Boulevard was robbed at gunpoint. According to the Complaint (#3), two masked
4   males entered the facility and ordered the patrons and employees to the floor. One of the robbers
5   pointed a firearm at a bank employee and ordered the employee to instruct the bank tellers, located
6   behind a bulletproof barrier, to give the robbers the money. The employee did as instructed. A bank
7   customer allegedly overheard one of the robbers state that he would "do this bitch" if the tellers did
8   not cooperate. The bank tellers complied and placed the money from each of the teller stations
9   through slots located in the bulletproof barrier. One of the robbers retrieved the money from the
10  individual teller stations. The robber also took cash from a male bank patron and a purse from a
11  pregnant female patron. A witness outside the Citibank branch observed the two masked individuals
12  flee the scene in a red Honda Civic with California plates. Witnesses also provided descriptions of
13  the two bank robbers.

14  Later that same evening, a Las Vegas Metropolitan Police Department K-9 Patrol Officer,
15  while in a marked Metro vehicle, observed a vehicle fitting the description of the vehicle used in the
16  earlier bank robbery. The officer observed the vehicle at Lorenzi Park located at 3333 West
17  Washington Avenue near North Rancho Drive in Las Vegas, Nevada. The suspect vehicle fled the
18  parking lot and traveled south on North Rancho Drive. Within blocks of the park, the vehicle struck
19  another vehicle at the intersection of North Rancho Drive and West Bonanza Road. The vehicle did
20  not stop but continued traveling south. The Metro officer followed the vehicle with his emergency
21  lights and sirens activated. At the intersection of South Rancho Drive and West Mesquite Avenue
22  the southbound vehicle entered the northbound lane of South Rancho Drive and was sandwiched
23  between two vehicles stopped at a traffic light. Despite several attempts to accelerate, the vehicle
24  was stuck. Consequently, the driver, later identified as Defendant Frank Morales, climbed out of the
25  driver side window and attempted to flee on foot. The front passenger, later identified as Nathan Ray
26  Dent, was immediately taken into custody. It was later determined that the vehicle, a red Honda
27  Civic with California plates, was stolen. A search of the vehicle revealed two firearms, a bag of
28  money and loose cash totaling approximately $9,400.00, a black knit mask, a white long sleeve shirt,

- 2 -

1  a purse with an identification card matching the pregnant bank patron, and a cellular phone
2  belonging to a male bank patron.

3       Subsequent to the bank robbery but prior to the high-speed chase, FBI Special Agent Jeffrey
4  Loaring-Clark received radio communication that a bank robbery had occurred. The communication
5  included a description of the two suspects and the vehicle used to flee the bank robbery. After
6  receiving the communication, Agent Loaring-Clark began to monitor Metro's radio traffic for
7  information regarding the robbery. After hearing the vehicle had been spotted by a Metro officer,
8  Agent Loaring-Clark observed the vehicle traveling at a high rate of speed near the Interstate 95
9  overpass (approximately North Rancho Drive and West Bonanza Road) and being pursued by a
10 Metro vehicle. Agent Loaring-Clark joined the pursuit of the vehicle and witnessed the suspect
11 vehicle entering the northbound lane of South Rancho Drive and being sandwiched between two
12 vehicles. Agent Loaring-Clark also witnessed Defendant Frank Morales attempt to flee on foot.

13      Within moments after the suspect vehicle crashed, Agent Loaring-Clark and his supervisor,
14 Lawrence Welko approached the vehicle. They removed Dent from the vehicle and placed him
15 under arrest. Dent was handcuffed and placed in the back seat of a marked Metro vehicle. Prior to
16 being placed in the vehicle, Dent identified himself verbally and provided a driver's license to law
17 enforcement. No *Miranda* warnings were given. Agent Loaring-Clark testified that Dent was
18 handcuffed and placed in a Metro vehicle for his own safety and to allow law enforcement to process
19 the scene. Approximately forty (40) minutes after Dent was arrested and placed in the Metro vehicle,
20 FBI Special Agent Gary McCamey arrived on the scene. Agent McCamey testified that he was
21 present because he had been asked to interview Dent. Agent McCamey did not ask Dent any
22 questions while Dent was in the back of the Metro vehicle at the scene. He also testified that he did
23 not observe any other law enforcement personnel questioning Dent at the scene.

24      Approximately one (1) hour after Dent was arrested and placed in the Metro vehicle at the
25 scene, Agents McCamey and Loaring-Clark took custody of Dent, placed him in Agent Loaring
26 Clark's agency vehicle, and transported him to the FBI office. The agents testified that they intended
27 to transport Dent to the FBI office, interview him and obtain booking information. Dent was not
28 advised of his *Miranda* rights before being put into the FBI vehicle or at anytime during the

- 3 -

1   approximate 10-15 minute trip to the FBI office.  During the trip to the FBI office Agent McCamey
2   and Dent engaged in a conversation regarding Dent's criminal history and current residence.  The
3   conversation revolved around information already known to law enforcement with the exception of
4   Dent's residence.  There was no communication regarding a third, female passenger apprehended
5   at the scene, nor was there any discussion about the facts or circumstances surrounding the alleged
6   robbery.

7        Upon arrival at the FBI office, Dent was placed in an interview room with Agents McCamey
8   and Loaring-Clark.  Agent McCamey testified that Dent was asked a series of routine booking
9   questions.  Dent was not advised of his *Miranda* rights prior to the booking questions.  The gathering
10  of the booking information took approximately ten (10) minutes.  After asking the booking
11  questions, Agent McCamey read Dent the *Miranda* warnings from the FBI's standard advice of
12  rights form.  *See* Gov't Exhibit 1.  The advice of rights form also provides a place where an
13  individual who is willing to waive his rights can sign – and thus waive the enumerated rights.  This
14  section provides that the individual waiving his rights has read the form and understands those rights
15  but is willing to answer questions without a lawyer.  After being read his *Miranda* rights, the form
16  was placed in front of Dent so that he could read and process the rights and determine whether he
17  was willing to answer questions without a lawyer.  Both agents testified that, when presented with
18  the form, Dent indicated that due to his prior criminal history there was no advantage in speaking
19  with the agents.  Consequently, Dent did not sign the waiver.  Both agents testified that, at the point
20  when Dent refused to sign the waiver, they understood Dent to be invoking his right to remain silent.
21  After refusing to sign the waiver, Dent did state that the girl in the car "had nothing to do with it."
22  This statement was unprovoked and made within seconds of Dent's refusal to sign the waiver.

23       After that statement, the agents remained in the interrogation room with Dent for
24  approximately five (5) minutes to allow the FBI's identification system to log on so the agents could
25  finish processing Dent (fingerprints and photographs).  During that five (5) minute period, the agents
26  testified that Dent made additional unprovoked statements.  Specifically, Dent inquired as to "how
27  much time" an armed robbery would carry.  Agent McCamey responded by asking if Dent was
28  asking because he would rather "do federal time."  Dent responded in the affirmative.  Agent

- 4 -

1   McCamey stated that he did not know how much time the charge might carry and that it was
2   something that Dent would have to "work out with the prosecutor." Once the FBI's system was
3   online, Dent was fingerprinted, photographed, and placed in a vehicle for transport to the North Las
4   Vegas Detention Center to be booked. During transportation, Dent made several incriminating
5   statements. The statements were unprovoked.

6        Now, Dent asks the court to suppress the alleged statements and their fruits on the grounds
7   that (1) they were obtained in violation of *Miranda* and (2) the statements were involuntary. The
8   Government argues that all of the statements Dent seeks to suppress were unprovoked by law
9   enforcement and given voluntarily after Dent received the *Miranda* warnings.

10                                    **DISCUSSION**

11   **1. Miranda**

12        The obligation to administer *Miranda* warnings attaches once a person is subject to
13   "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). Custody turns on
14   whether there is a formal arrest or restraint on freedom of movement of the degree associated
15   with a formal arrest. *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citing
16   *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002)). In addition to being in custody, the
17   accused must also be subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).
18   Not every question asked in a custodial setting constitutes interrogation. *U.S. v. Chen*, 439 F.3d
19   1037, 1040 (9th Cir. 2006) (citing *U.S. v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)).
20   "[I]nterrogation means questioning or 'its functional equivalent,' including 'words or actions on
21   the part of the police (other than those normally attendant to arrest and custody) that the police
22   should know are reasonably likely to elicit an incriminating response from the suspect." *Pope v.*
23   *Zenon,* 69 F.3d 1018, 1023 (9th Cir.1995) (quoting *Innis*, 446 U.S. 291 at 301). "The latter
24   portion of this definition focuses primarily upon the perceptions of the suspect, rather than the
25   intent of the police. *Id*.

26        Whether custodial questioning constitutes custodial interrogation is an objective inquiry,
27   and the subjective intent of the police, though relevant, is not determinative because the focus is
28   on the defendant's perception. *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (citation

- 5 -

1   omitted). "This focus reflects the fact that the *Miranda* safeguards were designed to vest a

2   suspect in custody with an added measure of protection against coercive police practices, without

3   regard to objective proof of the underlying intent of the police." *Innis*, 446 U.S. at 301. Thus,

4   the fact that a question is objective, or was not asked in an attempt to elicit evidence of crime, is

5   insufficient for finding that the questioning is not an interrogation. *Booth*, 669 F.2d at 1238.

6   "Even a relatively innocuous question may, in light of the unusual susceptibility of a particular

7   subject, be reasonably likely to elicit an incriminating response." *Id.* (citing *Innis*, 446 U.S. at

8   302 n. 8); *see also United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir.1993). Ultimately

9   "[t]he test is whether, under all the circumstances involved in a given case, the questions are

10   "reasonably likely to elicit an incriminating response from the suspect." *Chen*, 439 F.3d at 1040

11   (quoting *Innis*, 446 U.S. at 301).

12          Here, it is uncontested that Dent was in custody the moment he was arrested. Once in

13   custody, there are four distinct instances where Dent communicated with law enforcement: (1) at

14   the scene of the arrest; (2) during transportation to the FBI office; (3) at the FBI office in the

15   interrogation room; and (4) during transportation to North Las Vegas Detention Center.

16          **A. Statements Made At The Scene Of The Arrest And During Transportation To**

17   **The FBI Office**

18          Dent was arrested on suspicion of bank robbery immediately after the vehicle in which he

19   was a passenger wrecked following a high-speed chase through the streets of Las Vegas. After

20   his arrest, Dent was handcuffed and placed in the back of a Metro vehicle. Dent was not given

21   *Miranda* warnings prior to being arrested and placed in the Metro vehicle. At the scene of the

22   arrest law enforcement obtained Dent's routine background biographical information and his

23   driver's license. The routine gathering of background biographical information does not

24   constitute interrogation for purposes of *Miranda*. *See United States v. Washington*, 462 F.3d

25   1124, 1132-33 (9th Cir. 2006) (citations omitted).

26          **B. Statements Made During Transportation To The FBI Office**

27          After law enforcement secured the scene, FBI agents took custody of Dent in order to

28   transport him to the FBI office. The agents intended to transport Dent to the FBI office,

1   interview him, and obtain booking information. Dent was not advised of his *Miranda* rights

2   before being placed into the FBI vehicle, or at anytime during the approximate 10-15 minute trip

3   to the FBI office. During transport, Agent McCamey and Dent engaged in a conversation

4   regarding Dent's criminal history, parole status, and place of residence. According to Agent

5   McCamey's testimony, excepting Dent's place of residence, the conversation revolved around

6   details of Dent's criminal history already known to law enforcement.

7            There is no evidence that Dent was asked any direct questions regarding the bank

8   robbery, the individuals suspected of involvement, or the individuals in the vehicle at the scene

9   of the arrest. However, the mere absence of direct questions does not foreclose the possibility

10   that a suspect has been subject to "custodial interrogation." The conversation here centered on

11   facts already known to law enforcement. There is no indication or assertion that the conversation

12   resulted in any incriminating statements. Further, the circumstances do no support a finding that

13   law enforcement was making deliberate attempts to elicit incriminating information or that the

14   conversation was reasonably likely to do so. Accordingly, the court, while acknowledging that

15   the outcome under different factual circumstances may be different, finds that this conversation

16   did not amount to an "interrogation" for purposes of *Miranda*.

17            **C. Statements Made At The FBI Office And During Transportation To The North**

18   **Las Vegas Detention Center**

19            The crux of this dispute centers on statements made by Dent at the FBI office during a

20   post-arrest interview and during his subsequent transportation to the North Las Vegas Detention

21   Center. Upon arrival at the FBI office, Dent was placed in an interview room. Prior to initiating

22   the interview, Agent McCamey went back over the general booking questions with Dent. After

23   obtaining answers to general booking questions, Agent McCamey read Dent the *Miranda*

24   warnings. The warnings were read from the FBI's standard advice of rights form. The form

25   provides:

26            Before we ask you any questions, you must understand your rights. You have
            the right to remain silent. Anything you say can be used against you in court.
27            You have the right to talk to a lawyer for advice before we ask you any
            questions. You have the right to have a lawyer with you during questioning.
28            If you cannot afford a lawyer, one will be appointed for you before any

- 7 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> questioning if you wish. If you decide to answer questions now without a
> lawyer present, you have the right to stop answering at any time.

*See* Gov't Exhibit 1. The form also contains a section where an individual willing to waive his

rights can sign. By signing, the individual acknowledges he has read the form, understands his

rights, and is willing to answer questions without an attorney present. After Agent McCamey

read Dent his *Miranda* rights, he presented the form to Dent. When presented with the form

waiver, Dent indicated that due to his prior criminal history there was no advantage in speaking

with the agents. Consequently, Dent did not sign the waiver. Both agents testified that, at the

point when Dent refused to sign the waiver, they understood Dent to be invoking his right to

remain silent.

"Once a person invokes the right to remain silent, all questioning must cease." *Anderson*

*v. Terhune*, 516 F.3d 781, 784 (9th Cir. 2008) (citations omitted). A suspect's invocation of the

right to remain silent is not an insuperable bar to the admission of statements made after the

invocation. *See Michigan v. Mosley*, 423 U.S. 96 (1975) (rejecting the proposition that *Miranda*

bars law enforcement from ever questioning a suspect after the suspect had invoked the right to

remain silent). Rather, the "the admissibility of statements obtained after the person in custody

has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning'

was 'scrupulously honored.'" *Mosley*, 423 U.S. at 104. Courts look at the totality of the

circumstances to determine whether law enforcement scrupulously honored the defendant's

invoked right to remain silent. *United States v. Hsu*, 852 F.2d 407, 410 (9th Cir. 1988).

Here, within seconds of invoking his right to remain silent, Dent stated that he was

willing to say one thing – that "the girl in the car had nothing to do with it." After that

statement, the agents remained in the interrogation room with Dent for approximately five (5)

minutes to allow the FBI's identification system to log on in order to fingerprint and photograph

Dent. At some point during that five (5) minute period, the agents testified that Dent made

additional unprovoked statements. Specifically, Dent inquired as to "how much time" an armed

robbery would carry. Agent McCamey responded by asking if Dent was asking because he

would rather "do federal time." Dent responded in the affirmative. Agent McCamey stated that

- 8 -

1  he did not know how much time the charge might carry and that it was something that Dent

2  would have to "work out with the prosecutor."

3        Based on the record, the court finds that the statements made in the interview room were

4  not made in response to questioning or conduct on the part of law enforcement. Dent's statement

5  that the "girl in the car had nothing to do with it" was unprovoked and made within seconds after

6  invoking the right to remain silent. The statement that he would rather "do federal time" was

7  made subsequent to his invocation of the right to remain silent. It was made after he initiated a

8  conversation with Agent McCamey by asking "how much time" an armed robbery could carry. It

9  is the court's view that the agents exercised admirable restraint in this situation by simply

10 discerning the purpose of Dent's unprovoked question and informing Dent that it was a question

11 he should "work out with the prosecuting attorney." At no point during the exchange did the

12 agents seek to expand the scope of Dent's inquiries or re-open interrogation despite the

13 seemingly clear indication that Dent was willing to do so. Accordingly, based on the totality of

14 the circumstances, the court finds that the agents scrupulously honored Dent's invocation of his

15 right to remain silent and the statements were not obtained in violation of *Miranda*.

16      **D.  Statements Made During Transportation To The North Las Vegas Detention**

17 **Center**

18      After completing the administrative booking process (fingerprints and photograph) at

19 the FBI office, the agents placed Dent in a vehicle for transport to the North Las Vegas Detention

20 Center where he would be booked. During transportation Dent made several unprovoked,

21 spontaneous and incriminating statements. There is nothing in the record to suggest that the

22 statements were made in response to questioning or conduct on the part of law enforcement. A

23 spontaneous statement does not require a *Miranda* warning. *Beaty v. Steward*, 303 F.3d 975, 991

24 (9th Cir. 2002); *see also Cox v. Del Papa*, 542 F.3d 669, 675-76 (9th Cir. 2008). Further, there is

25 nothing in the record to suggest that the agents seized on any of the statements in an effort to

26 procure additional information or revisit Dent's prior invocation of the right to remain silent–the

27 agents continued to scrupulously honor Dent's prior invocation.

28 **2.  Voluntary Statements**

1           Dent claims that, even assuming technical compliance with *Miranda*, the court should

2  suppress the statements as involuntary. Inculpatory statements are voluntary when they are the

3  product of a rational intellect and a free will. *See Beaty v. Schriro*, 509 F.3d 994, 999 (9th Cir.

4  2007) (*citing United States v. Leon Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988)). The test is

5  whether, considering the totality of the circumstances, the government obtained the statement by

6  phsyical or psychological coercion or by improper inducement so that the suspect's will was

7  overborne. *Id.*

8           Dent's primary claim appears to be that his statements were involuntary because he was

9  experiencing "extraordinary elevated level[s] of emotions" as a result of the high-speed chase.

10  An elevated emotional state as a result of the high-speed chase was not the result of any coercion

11  from law enforcement. A defendant's state of mind, by itself, is not sufficient to demonstrate

12  that statements were made involuntarily. *Colorado v. Connelly*, 479 U.S. 157, 166-67 (1986).

13  "Coercive police activity is a necessary predicate to the finding that a confession" is involuntary.

14  *Id.*

15           Further, the testifying agents inability to verify whether Dent received medical attention

16  at the scene is not indicative of physical coercion. Both agents testified that Dent was not

17  exhibiting any external signs of physical discomfort and maintained a calm demeanor throughout

18  the time he was in their custody. Likewise, that Dent may not have been offered a drink at the

19  scene of the incident or prior to being placed in the interview room does not demonstrate

20  physical punishment through deprivation. Approximately two (2) hours passed between Dent's

21  arrest and his booking at the North Las Vegas Detention Center. Lack of water for such an

22  insignificant period of time, especially when there is no evidence of deliberate deprivation, can

23  hardly be classified as physical coercion. Dent also made passing reference to his lack of

24  education as a reason that his statements were involuntary. Only those subjective characteristics

25  that make a defendant more susceptible to subtle forms of coercion are relevant to the

26  voluntariness inquiry. *United States v. Huynh*, 60 F.3d 1386, 1388 (9th Cir. 1995). Dent's

27  extensive experience with the criminal justice system and prior criminal history suggest that his

28  lack of education would not make him especially susceptible to coercion. Moreover, because

1  there is no evidence of coercion, Dent's personal characteristics are irrelevant. *Derrick v.*

2  *Peterson*, 924 F.2d 813, 817 (9th Cir. 1990).

3      The record here is devoid of any evidence that Dent's statements were obtained through

4  physical or psychological coercion or by improper inducement. In addition to the foregoing, the

5  agents also testified that Dent appeared calm throughout the entire process. There is also no

6  evidence to suggest that law enforcement made any outward showing of force through the baring

7  or brandishing of firearms. Accordingly, the court finds that the Government has met its burden

8  to demonstrate that the statements were made voluntarily.

9  **RECOMMENDATION**

10      Based on the foregoing and good cause appearing therefore,

11      IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the

12  Defendant's Motion to Suppress (#25) be **DENIED**.

13  **NOTICE**

14      Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must**

15  **be in writing and filed with the Clerk of the Court on or before January 6, 2010 .** The Supreme

16  Court has held that the courts of appeal may determine that an appeal has been waived due to the

17  failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This

18  circuit has also held that (1) failure to file objections within the specified time and (2) failure to

19  properly address and brief the objectionable issues waives the right to appeal the District Court's

20  order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d

21  1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

22      DATED this 31st day of December, 2009.

ROBERT V. JOHNSTON
United States Magistrate Judge

- 11 -